59 CCPA

**Arthur W. LANGER, Jr. and Erik Tornqvist, Appellants,**

v.

**Daniel KAUFMAN and Bryce H. McMullen, Appellees.**

**Patent Appeal No. 8751.**

United States Court of Customs and Patent Appeals.

Sept. 21, 1972.

Harold Einhorn, Linden, New Jersey, attorney of record, for appellants.

Robert L. Baechtold, New York City (Fitzpatrick, Cella, Harper & Scinto), New York City, attorneys of record, for appellees; Joseph M. Fitzpatrick, New York City, of counsel.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN, and LANE, Judges, and CLARK, Justice (Ret.), United States Supreme Court, sitting by designation.

LANE, Judge.

This is an appeal from the decision of the Board of Patent Interferences awarding priority of invention of the sole count in issue to appellees (Kaufman). The count corresponds to a claim

in appellees' patent, U. S. Patent No. 3,109,822 (the Kaufman patent) issued November 5, 1963, on application Serial No. 731,082 (the Kaufman '082 application) filed May 6, 1958, and asserted to be a continuation application of Serial No. 662,017 (the Kaufman '017 application) filed May 28, 1957. Appellants (Langer) are involved on their application,[1] into which they copied a modified form of the count, filed April 30, 1964 to reissue U. S. Patent No. 3,032,511 issued May 1, 1962, on an application [2] filed December 11, 1959, as a continuation-in-part of application Serial No. 629,488 (the Langer '488 application) filed December 20, 1956. The interference included a third party, but no appeal was taken by said party from the board's decision. Only appellants took testimony. The board held that the Langer '488 application did not support the count, that appellants had failed to establish an actual reduction to practice, and that the board lacked jurisdiction to entertain appellants' contention that the Kaufman patent is "a nullity because of a defective oath" in the Kaufman '082 application apparently on the theory that the question is not ancillary to priority of invention. Our review of the record and briefs in this case leads us to affirm the board's decision.

## THE SUBJECT MATTER

The count is directed to a titanium trichloride ($TiCl_3$) composition which in combination with an organometallic compound is suitable for use as a catalyst for the polymerization of alphaolefin monomers, such as propylene and ethylene. It appears that prior to 1958 two forms of titanium trichloride were known and distinguished by their respective colors—brown and purple. It is now recognized that the purple titanium trichloride actually exists in three forms, labelled alpha, gamma and delta, one distinguished from the other by X-ray diffraction pattern. Each of the parties to this interference was attempt-

ing to obtain an effective cocatalyst component based on titanium trichloride. The count is directed to such a composition identified by chemical formula and X-ray diffraction pattern and reads as follows:

1. A homogeneous anhydrous trivalent titanium chloride aluminum chloride composition of matter having substantially the chemical composition $3TiCl_3 \cdot AlCl_3$ and the following X-ray diffraction pattern:

| d | $I/I_1$ |
| --- | --- |
| 5.91 | Very Strong. |
| 5.32 | Medium. |
| 5.10 | Do. |
| 4.55 | Weak-medium |
| 3.95 | Weak |
| 3.03 | Medium. |
| 2.94 | Weak-medium. |
| 2.90 | Do. |
| 2.72 | Do. |
| 2.52 | Strong. |
| 2.13 | Weak. |
| 1.96 | Weak-medium. |
| 1.80 | Medium. |
| 1.77 | Medium-strong. |
| 1.70 | Weak-medium. |
| 1.47 | Do. |

[d] = interplanar spacings expressed in angstrom units.

$I/I_1$ = relative intensities.

This brief description of the subject matter provides an adequate foundation for the consideration of the issues raised on this appeal. We treat the three principal issues seriatim.

### I. *Langer's Asserted Constructive Reduction to Practice*

Common to the involved Langer application, the patent of which it is a reissue application, the application on which the patent is based, and the Langer '488 application, which is the earliest in the chain, is an example labeled Run E which gives the following data:

```
Analysis of Catalyst Solids
   Atoms of (Ti                    1.00
            (Al                    0.33
            (Cl                    3.85
   Color                           Purple
   X-Ray Diffraction Pattern TiCl3.
```

The Langer patent includes the above data, but instead of "X-ray Diffraction Pattern $TiCl_3$," the patent states "X—

---

1. Serial No. 377,154.

2. Serial No. 858,861.

Ray Diffraction Pattern $TiCl_3$—gamma form." The application involved in this interference includes the data, the characterization of the $TiCl_3$ as the gamma form, and the actual X-ray diffraction pattern. Appellants contend that the earliest application made no reference to gamma form because the gamma form of $TiCl_3$ cocrystallized with $AlCl_3$ was not yet recognized in the art. Appellees assert that the absence of an X-ray diffraction pattern identifying the catalyst component in the '488 application is fatal to that specification insofar as support for the count is concerned.

The board held:

> Langer application Serial No. 629,488 does not disclose the invention defined by the count. There is no indication in this application that the party Langer recognized the product of Run E as being different from that of the prior art; the indications are, rather, to the contrary. * * * The observations as to the color and X-ray diffraction pattern of the catalyst of Run E do no more than identify the catalyst as being purple, crystalline $TiCl_3$, properties which the specification also attributes to prior art products prepared in a different manner.

The indications in the '488 specification to which the board referred were contained in the following portion of the specification in which prior art catalysts were discussed:

> These catalysts may be prepared by reacting an aluminum compound with a heavy metal compound at a temperature between about 20 and 90° C. Generally the product is a brown, amorphous catalyst which is unstable and tends to make a less crystalline polymer when activated with additional aluminum compound. If it is desired to make a highly crystalline polymer, for instance an isotactic polypropylene, the catalyst should have a crystalline structure. In the case of titanium, the crystalline titanium trichloride is identified by its purple or violet color and its characteristic X-ray diffraction pattern. While it is

known in the art that purple crystalline titanium trichloride may be prepared by reacting titanium tetrachloride with titanium at a temperature between about 400 and 500° C. under a pressure of about 10 to 50 atmospheres, or by reacting the tetrachloride with hydrogen in the presence of a glowing tungsten filament, there is no known method for preparing the crystalline form using organo-metallic compounds, e. g. aluminum triethyl, as the reducing agent.

It has now been discovered that highly crystalline polymerization catalysts, as well as catalysts of intermediate crystallinity, may be prepared at relatively low temperatures by reacting a metallic reducing compound with a reducible heavy metal compound under critical conditions which are hereinafter disclosed.

■■ We agree with the board that the '488 specification fails to provide support for the count and that there therefore was no constructive reduction to practice of the invention of the count. Admittedly, the diffraction pattern specifically recited in the count is not expressly described in the '488 specification. Appellants argue that it is the inherent pattern of the product described in Run E. To prove inherency, the burden is on appellants to show that the *"necessary and only reasonable* construction to be given the disclosure by one skilled in the art is one which will lend clear support to * * * [this] positive limitation in the interference count." Binstead v. Littmann, 242 F.2d 766, 770, 44 CCPA 839, 844 (1957). We do not think that that burden has been borne in this case.

The '488 specification disclosure does not necessarily lead to the conclusion that the Run E product was the gamma form. It could have been one of the other purple forms. The record shows that the various forms are distinguished by their respective X-ray diffraction patterns, and since no information as to the pattern of the Run E product is given in

the '488 specification, there is nothing to inevitably tie the Run E product to the gamma form of the cocrystallized $TiCl_3$. We hold that the '488 specification was not a constructive reduction of the invention of the count.

## II. *Langer's Asserted Actual Reduction to Practice*

Appellants assert that the invention of the count was actually reduced to practice prior to appellees' earliest filing date. Specifically, appellants contend that in May and June of 1956, a technician working under the direction of appellant Langer made the catalyst which were substantially the same as that described in Run E of the Langer specifications discussed above. The samples were bottled and labeled "1174–92." Appellant Tornqvist testified that he sent the 1174–92 samples to the analytical section for X-ray diffraction pattern determinations. At the trial of this interference, Tornqvist identified the diffraction patterns of the 1174–92 samples from photographs of the patterns taken in 1956 as that of the gamma form of cocrystallized $TiCl_3$.

The board held that appellants had failed to prove actual reduction to practice by a preponderance of the evidence. Said the board:

> While co-inventor Tornqvist testified that he obtained X-ray diffraction patterns and had photographs of such patterns prepared in June and August 1956, no evidence of any contemporaneous interpretation or evaluation of the patterns either by Tornqvist or by anyone else has been presented. * * * Tornqvist's 1968 testimony concerning interpretation of X-ray diffraction data cannot be dated back to June-August 1956.

We agree with the conclusion of the board and appellees' contention that Heard v. Burton, 333 F.2d 239, 51 CCPA 1502 (1964), is controlling. In *Heard,* this court held that conception and reduction to practice could not be established *nunc pro tunc.* Although appel-

lants in *Heard* had in fact prepared the new form of alumina catalyst involved in that case, there was no evidence of contemporaneous recognition that a new form had been discovered. Like the $TiCl_3$ catalyst of the present appeal, the new "eta" form of alumina catalyst was not known in the art until after the date to which the other party to the interference was entitled. The import of the court's holding is clear from the following:

> [W]e sustain the board since we are not convinced Heard had such a "definite and permanent idea of the complete and operative invention" [citation omitted] as to constitute conception within the meaning of the patent law. * * * We agree with appellant that it is irrelevant that Heard never referred to or appreciated the support material to be *eta-alumina* or to contain *eta*-alumina *by that name.* Nor do we interpret the board's opinion as so requiring. However, we consider it fatal to appellant's case that not until after appellees' filing date did Heard recognize that his "ammonia-aged" catalyst, as appellees put it, *"contained any different form of alumina at all!"*
>
> We point out, as does appellees' brief, that the count calls for a *particular* form of alumina and we think that appellant's failure to recognize that he had produced a new form, regardless of what he called it, is indicative that he never conceived the invention prior to appellees' filing date.
>
> * * * * * *
>
> We agree with appellees that this case is controlled by the precedents holding *nunc pro tunc* reduction to practice to be defective. As appellees say in their brief, " * * * In the present case it is the *recognition* and *appreciation* of the invention which was lacking to Dr. Heard prior to April 23, 1952 [appellees' filing date], and which Heard attempts now to provide by his later tests and acts after that date." [3]

3. 333 F.2d at 243–244, 51 CCPA at 1507–1508.

Appellants argue that Spero v. Ringold, 377 F.2d 652, 54 CCPA 1407 (1967), rather than Heard v. Burton, supra, is controlling in this case. They contend that, in *Spero,* this court rejected the view that inherency must be proved contemporaneously and perceive a conflict between *Heard* and *Spero.*

We find an essential difference between *Heard* and the present case on the one hand and *Spero* on the other. In *Spero,* the questions before the court were whether Spero's specification supported a count drawn to a steroid wherein a certain methyl group had an *alpha* steric configuration and whether the identical disclosure appearing in a working draft of the application established conception as of the date of the draft. The weight of the evidence supported the conclusion that *anyone* of ordinary skill in the art at the time of the alleged conception would have recognized the presence of the alpha orientation in the working draft. The court considered later-obtained evidence of that which was inherent in the draft along with other evidence and concluded that there must have been contemporaneous appreciation of the invention of the count. We do not view *Spero* as inconsistent with Heard v. Burton, and we specifically reaffirm *Heard.* Admittedly, some of the language in the *Spero* opinion is broad, but we do not consider *Spero* to have overruled any of the well-settled principles of conception or constructive reduction to practice.

▮ In the present case, while the interpretation of the X-ray diffraction patterns at trial does show that appellants did in fact prepare the gamma form, it is not evidence of appreciation at the time those patterns were generated that any new form had been made. All the other evidence is to the contrary. We conclude that there was no conception by appellants at the alleged point in time.

III. *The Allegedly Defective Kaufman Oath*

The essence of appellants' argument before this court is that the oath of the Kaufman '082 application, upon which the Kaufman patent issued, is false in its statement that:

This application discloses and claims only subject matter disclosed in their pending application, Serial No. 662,017 * * *.

In effect, the oath is that which is applied to applications, such as continuation applications, which contain no new matter as compared to the parent application. Appellants assert that new matter was included in the '082 application and that appellees perpetrated fraud on the Patent Office, within the meaning of that concept as it has come into focus in recent years, by signing an oath which states otherwise. The board did not rule on the substance of the charge for it held that it lacked jurisdiction over the validity of the Kaufman patent.

▮ In Norton v. Curtiss, 433 F.2d 779, 783, 57 CCPA 1384, 1389 (1970), decided after the board's decision in this case, this court held that the issue of misconduct on the part of a patent applicant is an issue ancillary to priority and therefore properly within the jurisdiction of the Board of Patent Interferences and the court. That holding reflected this court's sensitivity, which it shares with the other federal courts, to the act and consequences of fraudulent misconduct before the Patent Office. Our conclusion that the charge of fraud is ancillary to priority was unquestionably tied to our views on the nature of the charge as expressed in *Norton* in part as follows:

[W]e * * * subscribe to the recognition of a relationship of trust between the Patent Office and those wishing to avail themselves of the governmental grants which that agency has been given authority to issue. * * * [The Patent Office] must rely on applicants for many of the

facts upon which its decisions are based. The highest standards of honesty and candor on the part of applicants in presenting such facts to the office are thus necessary elements in a working patent system. We would go so far as to say they are essential.[4]

\* \* \* \* \* \*

[W]e \* \* \* repeat the words of the Supreme Court:

> A patent by its very nature is affected with a public interest. \* \* \* The far reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeking that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope.
>
> Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L. Ed. 1381 (1945). Where fraud is committed, injury to the public through a weakening of the Patent System is manifest.[5]

We felt then, as we do now, that unlike other assertions of invalidity or unpatentability, the charge of fraud has special significance, and we are unwilling to ignore it in reviewing an award of priority. We reaffirm our holding in *Norton* that the question of fraud is ancillary to priority, and the decision of the board declining jurisdiction is therefore erroneous.

In fairness to the board, appellants' arguments before the board focus on the alleged defect in the oath as such rather than on any misconduct on appellees' part in filing such an oath. However, it does appear that the element of misconduct was presented, and we do not think the issue can be fairly characterized as a new one on appeal. We regret not having the board's views on the merits of the charge, but we do not feel a remand

is warranted. We conclude that appellants have fallen short of carrying the heavy burden of proving alleged misconduct.

It appears that in the '017 application appellees misapprehended the chemical structure of the cocrystallized $TiCl_3$. The '082 application omitted references to the erroneous structural concept and certain studies and tests which purportedly confirmed the structural theory. Appellants claim that these omissions, as well as additions to the specification clarifying the correct structure of the composition, constituted new matter and that the examiner should have been notified that the '082 application contained new matter and was not entitled to the earlier filing date of the '017 application.

At the outset we note that the issue of appellees' support for the count is not before us. We do not have the contention that appellees are not entitled to the '017 filing date before us. We only have the issue of misconduct. Moreover, an important fact to recognize is that the '017 application had the characteristic X-ray diffraction pattern which is more important to the identification of the composition than the structural formula. It does not appear, therefore, that the '082 application contains new matter, but we need not expressly rule on that point.

Norton v. Curtiss, supra, sets forth the various elements which must be proved to sustain a charge of misconduct. One of these is that the alleged misrepresentation must be material, and as expressed in *Norton,* in our view, materiality extends to "[i]ndications in the record that the claims at issue *would* not have been allowed but for the challenged misrepresentations \* \* \*."[6] We have been directed to no such indications, and we have found none. Nor do we think it self-evident that representing an application to be a continuation

4. 433 F.2d at 793–794, 57 CCPA at 1403.

5. 433 F.2d at 796, 57 CCPA at 1406.

6. 433 F.2d at 795, 57 CCPA at 1405.

application when it is in fact a continuation-in-part is always material to the examiner's subjective decision to allow claims therein. It might be the case in some instances, but we cannot find it here even if we assume that such a misrepresentation was made.

For the reasons given, we at least doubt that the '082 oath is false, but in any event, we find no basis for concluding that appellees have exhibited any misconduct before the Patent Office.

The decision of the board awarding priority of invention to appellees is affirmed.

Affirmed.

59 CCPA