Herbert H. **SILVESTRI** and David A. Johnson, Appellants,

v.

Norman H. **GRANT** and Harvey E. Alburn, Appellees.

Patent Appeal No. 8978.

United States Court of Customs and Patent Appeals.

May 9, 1974.

Rehearing Denied Sept. 12, 1974.

Robert H. Berdo, Washington, D. C., Richard H. Brink, Syracuse, N. Y., attorneys of record, for appellants; Roylance, Abrams, Berdo & Kaul, Washington, D. C., of counsel.

Ellsworth H. Mosher, Arlington, Va., Vito Victor Bellino, New York City, attorneys of record, for appellees.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE, and MILLER, Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Patent Interferences awarding priority to appellee, the senior party, Grant et al. (hereinafter Grant). We reverse.

1. Patent 3,144,445, issued August 11, 1964, on an application, serial No. 247,394, filed December 26, 1962, assigned to American Home Products Corporation.

The sole count corresponds to claim 1 of Grant's patent,[1] on which he is involved in this interference. Appellants, Silvestri et al. (hereinafter Silvestri), provoked this interference by filing an application[2] after the issuance of the Grant patent, alleged to be a continuation-in-part of an earlier application.[3]

Silvestri took testimony and introduced documentary evidence to prove conception of the invention and its actual reduction to practice prior to Grant's filing date. Grant also took testimony and introduced exhibits. This was done, however, to rebut Silvestri's evidence rather than to prove a date of invention earlier than Grant's filing date. Accordingly, Grant is restricted to his December 26, 1962, filing date as his date of invention and that is the date Silvestri must overcome.

The count reads:

A new crystalline form of D-6-(2-amino-2-phenyl-acetamido) penicillanic acid characterized by being substantially free of water in the chemically bound state, having a molecular weight of about 349, having an infrared spectrograph as disclosed in Fig. 1 of the drawings, and possessing substantially greater storage stability than hydrated crystalline D-6-(2-amino-2-phenyl-acetamido) penicillanic acid.

D-6-(2-amino-2-phenyl-acetamido) penicillanic acid is an antibiotic generically known as "ampicillin." Both parties agree that a form of ampicillin was known to the prior art. However, it contained from 2.5 to 10% by weight of water, lacked storage stability, and the process by which it was obtained was too expensive to be commercially feasible. The count distinguishes from that prior art form of ampicillin.

In the Grant patent, the prior art form of ampicillin is referred to as "am-

2. Serial No. 408,191, filed November 2, 1964.

3. Serial No. 233,943, filed October 29, 1962, now U. S. Patent 3,180,862, issued April 27, 1965, assigned to Bristol-Myers Co.

picillin A" whereas the form defined by the count is designated "ampicillin B." Silvestri's application uses the terms "Form I" and "Form II," respectively, to designate the same forms of ampicillin.

▆▆▆ The board held Silvestri was not entitled to rely on his earlier-filed application as a constructive reduction to practice because it did not disclose the subject matter of the count[4] and also held he had not sustained his burden of proving beyond a reasonable doubt[5] either conception or actual reduction to practice of the invention prior to Grant's filing date.

### The Decision of the Board

The board held that Silvestri had not conceived or actually reduced the invention to practice before Grant's filing date and its opinion suggests that the ampicillin of the count had not been prepared prior to December 26, 1962, in the laboratories of Bristol Myers Co. (Bristol), the assignee of the Silvestri application. However, even more important to its decision was the board's conclusion that at the time the invention was alleged to have been made by Silvestri, there was no contemporaneous recognition that the new form of ampicillin defined by the count had been made. In this regard, the board made the following observations:

\* \* \* we have examined the entire testimony taken on behalf of Silvestri \* \* \* and fail to find any evidence or [sic, of?] recognition or conception of the invention of the count *prior* to December 26, 1962, the record date of Grant. \* \* \*

\* \* \* \* \* \*

\* \* \* since Silvestri had no conception of the invention of the count

prior to Grant's record date, on this ground alone, Silvestri cannot prevail in this proceeding and we so hold.

The board was obviously motivated to some extent to reach this conclusion because of the nature of the circumstances which led to the preparation and filing of the Silvestri application. It appears that Mr. Brink, counsel who prepared the Silvestri application, became aware of the Grant patent shortly after its issuance and began an investigation to determine whether the compound of the count had been prepared at Bristol. In response to interrogatories, Brink made the following statement, quoted in the board opinion, regarding his investigation:

The investigation included discussing with David A. Johnson the subject matter of the invention claimed in U. S. Patent No. 3,144,445 and determining from him that anhydrous α-aminobenzylpenicillin possessing considerably greater storage stability than previously known hydrated α-aminobenzylpenicillin had been prepared early in 1962 by a process which he and Herbert H. Silvestri had invented, which process is described in U. S. Patent No. 3,180,862. I obtained, either from Dr. Johnson or someone else in the pilot plant, the run data for making \* \* \* anhydrous D–(-)-α-aminobenzylpenicillin. I then obtained the infrared curve for this lot from someone in the Control Group and stability data for this lot from someone in the Product Development Group. Mr. Joseph Bomstein examined the infrared tracing for [this] lot \* \* \* and compared it to the infrared tracing contained in Figure 1 of U. S. Patent 3,144,445 and con-

---

4. Silvestri's Notice of Appeal alleges that the board erred on this point. However, we deem that this allegation was abandoned as a basis for reversing the board since it was not discussed in the main brief. In the reply brief it is stated that "the sole reason Appellants are not pressing their reliance upon the disclosure of their earlier application is in order to simplify the issues involved in this appeal."

5. This is the burden of proof which must be met by Silvestri, whose earliest application *disclosing* the invention was filed after the issuance to Grant of a patent claiming the invention. Paivinen v. Sands, 399 F.2d 697, 55 CCPA 1502 (1968) and Paivinen v. Sands, 339 F.2d 217, 52 CCPA 906 (1964).

firmed the fact that they were substantially identical.

In view of these circumstances the board drew the following negative inference relative to appellant's recognition of the invention:

> In conclusion, although not necessarily dispositive of the issues before us, in our opinion, it seems that the appearance of the involved Grant patent on the scene was the spur that led to or catalyzed the filing of the involved Silvestri application.

Also before the board was the question of whether Silvestri abandoned, suppressed or concealed the invention within the meaning of 35 U.S.C. § 102(g). However, in view of its determination that Silvestri had not reduced the invention to practice, the board did not reach that issue.

### OPINION

■ The ampicillin of the count is a new form of an otherwise old composition. It is now well settled that in such a case there is no conception or reduction to practice where there has been no recognition or appreciation of the existence of the new form. Heard v. Burton, 333 F.2d 239, 51 CCPA 1502 (1964); and Langer v. Kaufmann, 59 CCPA 1261, 465 F.2d 915 (1972).

The evidence in both of the above cases established that the appellants had actually obtained the novel subject matter[6] at a date earlier than the dates of invention accorded their opponents. However, in each instance the evidence also established that this success was not recognized until a later date. Absent a contemporaneous recognition that the new form had been obtained, and, in Heard, absent a recognition that it had been used in the claimed process, we held that there had not been conception or reduction to practice.

■ The rule applied in Heard and Langer is consistent with the principle of patent law that an accidental and unappreciated duplication of an invention does not defeat the patent right of one who, though later in time, was the first to recognize that which constitutes the inventive subject matter. See Eibel Process Co. v. Minnesota and Ontario Paper Co., 261 U.S. 45, 66, 43 S.Ct. 322, 67 L.Ed. 523 (1923). In the context of Heard and Langer, therefore, until they recognized their accomplishment, the preparation of the new form by each of the appellants remained in the accidental and unappreciated category. A fortiori, no right to a patent arose prior to such recognition.

■ The effect of these cases is that an inventor of a new form of an old composition cannot be accorded a date of invention earlier than the date when he recognizes the existence of the new form. Accordingly, the principal issue before us now is whether the evidence establishes beyond a reasonable doubt that, prior to Grant's filing date, Silvestri not only actually prepared Form II, but also appreciated that a new form of ampicillin had been obtained. We think it does.

The record establishes that a great deal of work was done in the pilot plant at Bristol on an improved procedure for making "P50", the code name at Bristol for any and all forms of ampicillin.[7] This procedure is summarized in a memorandum, Silvestri Exhibit (SE) 5, dated April 2, 1962, that was prepared by Dr. David A. Johnson, named as a coinventor with Silvestri, who was head of the Chemical Development Laboratories at Bristol. SE 5 itself contains no reference to a product differing from the ampicillin previously prepared at Bristol. However, Johnson testified on cross-examination that he and Silvestri came to

---

**6.** In Heard, the count defined a process using a novel form of alumina. In Langer, the count was directed to a novel form of a titanium chloride-aluminum chloride complex.

**7.** The record establishes that in addition to Forms I and II at least two other forms of ampicillin are known. Both of these are the subject of patents assigned to Bristol. One of these is a trihydrate. The other is yet another anhydrous form free of bound water.

realize that a different form of ampicillin could be obtained by this process from the results of, among other things, infrared analysis˙ and water assays. When pressed regarding when this awareness arose, he testified that he thought it was in April of 1962.

It was the practice at Bristol to assign code numbers to the lots of ampicillin prepared. The code uses the designation "12 CD" followed by a number specific to each individual lot. For each lot a standard form was prepared, known as a "dog eared card," on which the results of a variety of analytical determinations made on the sample were recorded. Among the analyses performed were infrared, water assays, and storage stability tests. There were, in fact, two storage stability tests. One of these was a chemical test known as an "iodometric assay," the other was a biological test which involved subjecting the bacterium *Staph. aureus* to the ampicillin to determine if it was killed. Both tests were standard methods used by the pharmaceutical industry to determine the stability of penicillin and related antibiotics. Ampicillin is a penicillin-type antibiotic.

### The Record Establishes that Form II Ampicillin Was Prepared at Bristol Prior to December 26, 1972

Of particular interest on the question whether Form II ampicillin was actually made at Bristol are pilot plant lots 12 CD 57, 12 CD 61, 12 CD 71, 12 CD 82, 12 CD 100, 12 CD 106, 12 CD 107, and 12 CD 131 (also designated K 2035 [8]).

Between April 4, 1962, and September 24, 1962, these lots were analyzed for their water content. The results ranged from 0.3% water, in the case of 12 CD 100, to 1.8%, for 12 CD 82, as determined by what is referred to as the "Karl Fischer" method. Although this method is a standard analytical technique, it cannot distinguish between chemically bound water, a property exhibited by hydrates, and water present as an impurity. Nevertheless, whether this water is bound or not, samples which exhibit from 0.3% to 1.8% of water are "substantially free of water in the chemically bound state," as called for by the count.[9]

These same lots were also subjected to infrared analyses before December 26, 1962. The spectrographs obtained were examined by Bristol's expert in infrared spectroscopy, Joseph Bomstein. Testifying as an expert, he stated that the spectrograph of each lot was essentially the same as that of Figure 1 of the Silvestri application. It is pertinent to note here that no challenge has been made to the substantial identity of this spectrograph with that of Figure 1 of the Grant patent.

■ No challenge has been made regarding Bomstein's qualification as an expert and no rebuttal to his testimony was offered by Grant. We note that the board was critical of Bomstein's testimony on the ground that it came after the issuance of Grant's patent. That criticism would, of course, be relevant if the testimony were relied upon to show that Silvestri had appreciated in 1962 that a new form of ampicillin had been made. However, Bomstein's testimony is used only to establish that Silvestri had *obtained* the new form of ampicillin before December 26, 1962. Accordingly, we accept this testimony as establishing that the ampicillin obtained by Silvestri and that of the count have the same spectrograph.

8. The "CD" numbers are assigned for purposes of the Chemical Development Laboratory. K 2035 is the "Bristol Control Number" for Lot 12 CD 131, which was given this number as it was intended that it be used as a standard against which other lots of ampicillin were to be compared.

9. The Grant patent contains the following statement:

This new compound [referring to ampicillin B] is characterized by the fact that it has very little, if any, water, up to no more than 2.5%.

The upper limit stated in the Silvestri application and found in the analysis of the pilot plant lots is 1.8%.

■ We believe that the results of the water assays and infrared analyses establish beyond a reasonable doubt that Silvestri had actually prepared a form of ampicillin corresponding to that obtained by Grant and thus to the count. In reaching this conclusion, we do not disregard the fact that the count also requires that the ampicillin possesses greater storage-stability than hydrated ampicillin [10] and have a molecular weight of about 349. However, we regard these as inherent properties of Form II ampicillin which add nothing to the count definition beyond that determined by the water content and infrared spectrograph. In our view, these latter properties are sufficient to fully identify the new form of ampicillin. See footnote 8 of In re Ruschig, 343 F.2d 965, 52 CCPA 1238 (1965).

### The Record Establishes That Silvestri Recognized and Appreciated That A New Form of Ampicillin Had Been Obtained

Although we have concluded that Silvestri had actually prepared Form II ampicillin before December 26, 1962, there still remains the question whether, before that date, he recognized and appreciated that a new form of ampicillin had been obtained.

In Heard v. Burton, supra, the count involved was directed to a process which required "a catalyst comprising platinum on eta alumina." Prior to the date of invention alleged by Heard, the existence of eta alumina had not been reported in the prior art although the evidence established that Heard's research had resulted in the preparation of eta alumina. Nevertheless, the court denied Heard his alleged date of invention. We said:

> We agree with appellant that it is irrelevant that Heard never referred to or appreciated the support material to be *eta*-alumina or to contain *eta*-alumina *by that name*. Nor do we interpret the board's opinion as so requiring. However, we consider it fatal to appellant's case that not until after appellees' filing date did Heard recognize that his "ammonia-aged" catalyst, as appellees put it, "*contained any different form of alumina at all!*"

We point out, as does appellees' brief, that the count calls for a *particular* form of alumina and we think that appellant's failure to recognize that he had produced a new form, regardless of what he called it, is indicative that he never conceived the invention prior to appellees' filing date.

■ The quoted passage sets forth the standard by which we evaluate Silvestri's evidence. This standard does not require that Silvestri establish that he recognized the invention in the same *terms* as those recited in the count. The invention is not the *language* of the count but the subject matter thereby defined. Silvestri must establish that he recognized and appreciated *as a new form*, a compound corresponding to the compound defined by the count.

As pointed out above, his coinventor Johnson testified that he and Silvestri became aware that a new form of ampicillin was produced from the results of infrared analyses and water assays done on samples made according to the procedure set forth in SE 5. He thought this awareness came in April of 1962. We now look to the record for confirmation of this fact.

The evidence shows that ampicillin (or P50) was being manufactured at Bristol and that routine analyses, including infrared and water assays, were obtained from lots prepared in the pilot plant. All the infrared spectrographs for the lots of ampicillin previously enumerated, except 12 CD 106 and 12 CD 107, were obtained by a single employee, David A. Hull, at Bristol. With respect to the spectrograph for lot 12 CD 57, on April 7, 1962, he made entries in the infrared master log (SE 36) and his own

---

10. There is evidence in the record which establishes that the lots in question were storage stable.

notebook (SE 37). The notation in the master log reads:

12 CD 57 (P50) different xyl [crystal] form.

The notation in the notebook reads:

12 CD 57 (P50) conforms, 2nd crystalline form, bands much sharper than normal P50.

He testified that these notations represent conclusions drawn from comparison of the spectrograph of 12 CD 57 and that of the standard.

The dog-eared card for lot 12 CD 71 (SE 33) bears the following entry relative to the infrared spectrograph:

By I.R. [infrared] this sample looks different crystallographically from most other P50's. (A) Second Polymorph? (B) More Amorphous?"

This entry was in the handwriting of John P. Messerly, Director of Quality Control at Bristol. He testified that the entry was based on conclusions reached by Bomstein. Bomstein confirmed this. It was thought that these entries were made on April 22, 1962, and the record establishes that they could not have been made later than May 29, 1962.

The infrared spectrographs for lots 12 CD 106 and 12 CD 107 were obtained by Mr. Ithamar E. Pollak. Mr. Pollak worked under Mr. Bomstein during the period when the invention was alleged to have been made. His notebook, SE 40, contains the following entry, dated July 5, 1962, relative to these lots:

All confirm Form two of P50.

Pollak also entered the notation "Form II" on the corresponding dog-eared cards. His explanation of the meaning of these entries was that Bomstein had told him that there were two forms of ampicillin and had given him samples of lots 12 CD 106 and 12 CD 107 for a determination of which form they were. He further testified that he made the identification entered in his notebook by comparing their spectrographs.

At about the same time these infrared spectrographs were being studied, stability tests were being run on the pilot plant lots. The results of these tests were such that Mr. Frank H. Buckwalter, Director of Product Development at Bristol, was moved to send a memorandum (SE 6) to Johnson in which he pointed out that lots of ampicillin which were essentially anhydrous, including lots 12 CD 57 and 12 CD 71, have good stability.

This evidence confirms Johnson's testimony that prior to December 26, 1962, it was realized that a new form of anhydrous ampicillin having improved stability had been obtained. Any weakness in the evidence, as discussed to this point, that might suggest a reasonable doubt is removed by the fact that on November 5, 1962, Bristol sought promulgation of regulations for a new form of ampicillin from the Food and Drug Administration (FDA) in order that they might market it. Included with the request (SE 47) was a product specification (SE 46) setting forth a description of the new drug which corresponds to that of the lots which we have held correspond to subject matter defined by the count. Certificates of analyses of individual lots of this new form were also included with the request. One of these (SE 44) is for lot K 2035, one of the lots enumerated above, which is an actual lot of Form II ampicillin.

The board's opinion is critical of the testimony of those who obtained the infrared spectrographs for the reason that they could not say of their own knowledge what the reference spectrographs were. But this is not a fatal weakness in appellant's case. As we have already stressed, the critical question is whether there was contemporaneous recognition and appreciation of the new form of ampicillin. The testimony of these persons establishes that there was recognition and appreciation, even though identification of a given lot of ampicillin as Form I or Form II could not be made from an infrared spectrograph without resort to comparison with a standard.

The board also criticized appellants' water assays for the reason that they

imply no recognition that the lots were "substantially free of water in the chemically bound state," as called for by the count. However, the language of the count is but one way to define the new form and certainly not a unique definition. Our opinion in Heard v. Burton, supra, makes it clear that the recognition and appreciation of a new form need not be in the same terms as the count. In our view, appellants have established that they were able to recognize the new form by its infrared spectrograph and lower water content. Any claim they might have written, based on this or other information specific to Form II, would still define the same subject matter as the count even though in different terms.

Appellee Grant criticizes the evidence related to the request for certification made to the FDA on the ground that the testimony of Dr. Harold A. Frediani, the official requesting the certification, indicates that Bristol was actually trying to have certified a trihydrate form of ampicillin. This is not an accurate characterization of that testimony. In fact, Dr. Frediani testified that they sought to have the anhydrous form certified, but later amended the certification request to specify the trihydrate for the reason that, as he recalled, "a [another] new form was developed in our laboratory in the production area, which was the trihydrate, and a comparison of the two [Form II and the trihydrate] indicated there was a certain advantage to the trihydrate over the anhydrous."

### The Record Establishes That The New Form Had Utility

■ Before the board, Silvestri argued that no testing of the new form to show utility would be required because utility would be obvious. In the alternative, it was argued that the tests done to determine stability which involved subjecting the bacterium *Staph. aureus* to the ampicillin proved utility.

With regard to the first argument by Silvestri, the board commented:

The count in the instant case is directed to a new compound. We note, in spite of the fact that Silvestri urges in the brief that the utility of the purported compound was obvious, several lots were tested at Bristol against Staphylococcus aureus. We find no evidence in the Silvestri record to indicate that these tests were unnecessary.

We disagree with the board's position on several points and conclude that utility would have been obvious. In the first place, Form II is not a new compound but a new form of an old one, i. e., ampicillin. There is no reason to believe that the crystal structure and absence or presence of bound water would affect the pharmacological properties of ampicillin. Furthermore, the tests in question were run to demonstrate shelf stability of specific lots. Nevertheless utility can be inferred from these tests because a harmful bacterium was killed even though the tests were not run for that purpose.

The board also concluded that the stability tests did not establish utility for the reason that:

Of course, even if the tests were a success, as we have seen supra, the product tested therein was not established to be the product of the count, but rather P50.

The error in this conclusion by the board is apparent from our opinion, as it is our view that the product tested was the product of the count. Accordingly, we must regard these tests as actually establishing that Form II has a utility, even were we to agree that its utility was not obvious.

### Silvestri Did Not Abandon, Suppress, Or Conceal the Invention

■ Since we are satisfied that Silvestri has proven beyond a reasonable doubt an actual reduction to practice of the invention no later than November 5, 1962, the date of the request to the FDA, we must now address the question whether that invention was abandoned, suppressed, or concealed within the

meaning of 35 U.S.C. § 102(g). We have noted above that the board did not reach this issue. Although we would find it useful to have the board's views on this point, we do not feel this is one of those cases in which a remand to the board is necessary. Cf. Myers v. Feigelman, 59 CCPA 834, 455 F.2d 596 (1972) and Langer v. Kaufman, supra.

■ We do not doubt that Silvestri was moved to file the application by knowledge of the Grant patent. However, this fact alone is not sufficient to establish abandonment, suppression, or concealment of the invention. See Brokaw v. Vogel, 57 CCPA 1296, 429 F.2d 476 (1970).

Although Grant alleges generally that the invention was abandoned, suppressed, or concealed by Silvestri, his argument is in fact an attempt to demonstrate abandonment. Without more evidence to the contrary, the fact that Silvestri sought FDA registration of the new form, even though the request was later amended, shows there was no attempt to suppress or conceal the invention. The principal reliance by Grant is on Silvestri's delay in filing and the fact that his application was made as a result of the issuance of the Grant patent. Although these facts in certain contexts might be some evidence of abandonment they are not enough in themselves to establish a prima facie case.

■ Furthermore, the record shows that stability tests were being run on lots of Form II until at least 1966. While tests done after the issuance of the Grant patent might be said to have been done merely to preserve the appearance of non-abandonment, SE 43, a record of stability tests, shows that a biological assay was done on lot 12 CD 61 on April 21, 1964, and the same test was performed on lot 12 CD 100 on July 10, 1964, just one month prior to the issuance of the Grant patent. This activity is certainly evidence of continued interest in Form II ampicillin at Bristol and clearly negatives abandonment.

■ The burden of proving abandonment, suppression, or concealment is on the party alleging it. Gallagher v. Smith, 206 F.2d 939, 41 CCPA 734 (1953). In our view the evidence is not sufficient to sustain appellee's burden on that contention.

For the foregoing reasons, the decision of the board is reversed.

Reversed.

MILLER, Judge (concurring).

The decisive question in this case is whether appellants have sustained their burden of proving beyond a reasonable doubt that before December 26, 1962, they *recognized* that they had obtained Form II ampicillin. That they had actually obtained it, as the majority finds, is amply supported by the record, including Bomstein's unrebutted testimony that the spectrograph of each of various lots, particularly K2035, was the same as Figure 1 of appellants' application.

Appellees have attached great significance to the Rule 131 affidavit (included in the file wrapper of the Form III patent, 3,472,841, assigned to Bristol-Myers) asserting actual reduction to practice of Form III ampicillin prior to December 26, 1962. The affidavit is significant, as appellees point out, in showing that the contemporary, recorded statements of Hull, Messerly, and Pollak, and the testimony of Dr. Johnson are ambiguous in that these distinguish *a* form of ampicillin from Form I, but do not differentiate between Form II and Form III. However, the affidavit is also significant in that the accompanying spectrograph for lot 12CD149 contains a notation "Form III." The date "11/23/62" in the "CD Book" (appellants' exhibit 24) is that on which the number 12CD149 was assigned. Thus, on or after November 23, 1962, but prior to the critical date of December 26, 1962, there was recognition of Form III. If there were recognition of Form III, there had to be recognition of Form II.